Anton KURZYNSKI, Ruth Kurzynski, Norman Mierow, Richard Wargin, Phillip Barnard and Karen Faestel, Plaintiffs,

v.

Allen W. SPAETH, D.D.S., Continental Casualty Co., Professional Medical Insurance Co., Dr. Thomas Roskos, Wisconsin Physicians Service Insurance Corporation, Northwest General Hospital, Wisconsin Health Care Liability Insurance Plan, and Wisconsin Patients Compensation Fund, Defendants,

Dr. William FABER, Defendant-Respondent,

v.

MILWAUKEE MAGAZINE, Stephen Filmanowicz and Susan Dale, Appellants. [Case No. 94–1279.]

Mary WENDORF and Robert Wendorf, Plaintiffs,

WEST ALLIS MEMORIAL HOSPITAL, INC., Involuntary-Plaintiff,

v.

PROFESSIONAL MEDICAL INSURANCE COMPANY, a foreign insurance corporation, Physicians Insurance Company of Wisconsin, Inc., a Wisconsin insurance corporation, Thomas Roskos, D.O., Continental Casualty Company, a foreign insurance corporation, Alan W. Spaeth, D.D.S., Wisconsin Health Care Liability

Insurance Plan, a Wisconsin insurance corporation, Northwest General Hospital, and Wisconsin Patients Compensation Fund, Defendants,

William FABER, D.O., Defendant-Respondent,

v.

MILWAUKEE MAGAZINE, Stephen Filmanowicz and Susan Dale, Appellants. [Case No. 94–1282.]

Court of Appeals

*Nos. 94–1279, 94–1282. Submitted on briefs July 11, 1995.—Decided August 1, 1995.*

(Also reported in 538 N.W.2d 554.)

On behalf of the appellants, the cause was submitted on the briefs of *Jeffrey J. Kassel* and *Brady C. Williamson* of *La Follette & Sinykin*, of Madison.

On behalf of the defendant-respondent, the cause was submitted on the briefs of *Robert J. Kay* of *Kay & Andersen, S.C.*, of Madison.

Before Sullivan, Fine and Schudson, JJ.

FINE, J.   This is an appeal from an order of the trial court enforcing discovery subpoenas issued to employees of *Milwaukee Magazine* in malpractice actions against, *inter alia*, William Faber, D.O. We reverse.

## I.

The plaintiffs in the underlying actions claim that Dr. Faber and others were guilty of malpractice in their treatment of the plaintiffs' pain. In its January 24, 1994, issue, *Milwaukee Magazine* published a lengthy article about Dr. Faber. The article, entitled "bone of contention" (lack of capitalization in original), summarized its scope in its preamble:

When Dr. William Faber and his associates told hundreds of long-suffering patients that their diseased jaws were behind the pain in other parts of their bodies, many of them had their teeth removed or their jaws surgically scraped. Why, then, have other doctors and dentists seen no reason for many of the procedures? Are Faber and his team on the verge of a breakthrough — or practicing a harmful form of medicine?

Anton Kurzynski, Norman Mierow, Richard Wargin, Philip Barnard, Karen Faestel, and Mary Wendorf, plaintiffs in these consolidated cases, were some of Dr. Faber's patients who were discussed in the article. Prior to the article's publication, Dr. Faber's attorney served upon *Milwaukee Magazine*, its associate editor, Stephen Filmanowicz, and Susan Dale, a temporary research assistant working with Filmanowicz on the Faber article, subpoenas issued under RULE 804.05, STATS., seeking Filmanowicz's and Dale's testimony and the production of:

> All documents and records pertaining in any way to interviews or conversations of you or any Milwaukee Magazine employees or agents with any persons in any way related to litigation involving Dr. William Faber, the Milwaukee Pain Clinic, or the subject matter of biological dentistry, including but not limited to, attorneys for any of the parties to said litigation, patients of Dr. Faber or the Milwaukee Pain Clinic, and any expert witnesses or consultants on the subject matter of said litigation or biological dentistry. Documents and records to be produced include, but are not limited to, tape recordings, computer disks, written documents, notes, memorandums, calendar entries, and telephone messages.

The trial court directed that Filmanowicz and Dale "give testimony and produce documents" that "relate in any way to communications whether oral or in writing, transmission of documents or information in any other form or contacts of any kind between said Stephen Filmanowicz or Susan Dale and plaintiffs or their designated expert witnesses regarding the subject matters in the above-captioned actions."[1] Dale is the wife of Fred A. LaCourt, D.D.S., whom both sides tell us is one of the Wendorfs' expert witnesses and who is also mentioned in the *Milwaukee Magazine* article.

## II.

■

This case presents an issue of first impression in Wisconsin: the extent to which parties to civil litigation may have discovery of non-party journalists. RULE 804.01(2)(a), STATS., provides that parties to civil litigation "may obtain discovery regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action" even though the information sought would not be admissible at trial as long as "the information sought appears reasonably calculated to lead to the discovery of admissible evidence." (Emphasis added.) RULE 804.05(1), STATS., permits parties to depose "any" non-party person, subject to the distance limitations set out in RULE 804.05(3)(b)4, STATS., and, by reference to the subpoena-procedure set out in RULE 805.07, STATS., to compel that person "to produce books, papers, documents, or tangible things designated" in the subpoena. Filmanowicz and Dale

---

[1] Dr. Faber has not cross-appealed from the trial court's order and does not claim that the limitation on the scope of his inquiry was error.

assert that they have a privilege not to comply with the subpoenas, as limited by the trial court's order, because the information sought was given to them in their capacity as journalists. They do not contend that any of the information subject to the trial court's order was given to them in return for a promise of confidentiality.

Testimonial privileges in Wisconsin are governed by CHAPTER 905, STATS. RULE 905.01, STATS., reaffirms, that parties in litigation are entitled to every person's evidence, except when a person from whom evidence is sought has a privilege that is "inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin."[2] Journalists in Wisconsin have a qualified privilege based on Article I, section 3, of the Wisconsin Constitution not to disclose information gathered by them in the course of their journalistic endeavors. *Green Bay Newspaper Co. v. Circuit Court*, 113 Wis. 2d 411, 419, 335 N.W.2d 367, 371–372 (1983) (criminal case where defendants sought access to a journalist's confidential sources).[3] *No person*, however, whether

---

[2] RULE 905.01, STATS., provides:

**Privileges recognized only as provided.** Except as provided by or inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin, no person has a privilege to:
 (1) Refuse to be a witness; or
 (2) Refuse to disclose any matter; or
 (3) Refuse to produce any object or writing; or
 (4) Prevent another from being a witness or disclosing any matter or producing any object or writing.

[3] Article I, section 3, of the Wisconsin Constitution provides:

Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of

journalist or not, may be forced to respond to a subpoena in Wisconsin unless the party seeking the information encompassed by the subpoena makes a preliminary showing that justifies the intrusion. *Id.*, 113 Wis. 2d at 421, 335 N.W.2d at 372. Thus, even in criminal cases, where a defendant's right to evidence is protected by the constitutional guarantee of compulsory process, there must be "some proof, beyond mere speculation, that there is a reasonable probability that the subpoenaed witnesses' testimony will be competent, relevant, material and favorable to his defense," or that there "is a reasonable probability" that the subpoenaed witnesses' testimony will lead to the discovery of admissible evidence. *Id.*, 113 Wis. 2d at 421–422, 335 N.W.2d at 372–373. Journalists, however, are given greater protection from the intrusions and disruptions of having to comply with discovery subpoenas seeking evidence gathered in the course of their work as journalists than are other witnesses. In order to prevent parties from using journalists as investigative tools, a party seeking evidence gathered by the journalist must also show "by a preponderance of the evidence either that he has investigated all reasonable and available alternative sources" for the information sought, "or that no such sources exist." *Id.*, 113 Wis. 2d at 422–423, 335 N.W.2d at 373.

Although *Green Bay Newspaper Co.* was decided under Article I, section 3, of the Wisconsin Constitution and not the First Amendment to the United States

the press. In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact.

Constitution, most litigation over a journalist's qualified privilege has been under the First Amendment.[4] Indeed, Wisconsin and the other states may not abridge whatever privileges journalists have under the First Amendment, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 264–265 (1964), and the original formulation of a journalist's privilege in Wisconsin was under the aegis of the First Amendment, *see State v. Knops*, 49 Wis. 2d 647, 652, 183 N.W.2d 93, 95 (1971). *Knops* held that an editor of the Madison, Wisconsin, newspaper *Kaleidoscope* could be compelled to answer "five very narrow and specific questions" posed during a grand-jury inquiry into whether there was a conspiracy tying an arson on the Wisconsin State University campus at Whitewater, Wisconsin, to the bombing of Sterling Hall at the University of Wisconsin's Madison campus. *Id.*, 49 Wis. 2d at 649, 658, 183 N.W.2d at 98. The court applied a balancing test similar to the one applied in *Green Bay Newspaper Co.*—weighing the need for the information against the likelihood that the information sought was available through alternative sources. *Knops*, 49 Wis. 2d at 658–659, 183 N.W.2d at 99.[5]

---

[4] U.S. CONST. amend. I provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

[5] *Knops* held that there was a compelling need for the information, which "could lead to the apprehension and conviction" of those who bombed Sterling Hall, and that law enforcement did not have to pursue alternative sources of that information first because the fact that the police sought the information from the editor was "nearly conclusive proof" that they did not

The *Knops* analysis foreshadowed that of
*Branzburg v. Hayes*, 408 U.S. 665 (1972), which held
that journalists could be compelled to answer questions
posed during a grand-jury investigation of criminal
activity. *Id.*, 408 U.S. at 690–692. As noted by *Zelenka
v. State*, 83 Wis. 2d 601, 618, 266 N.W.2d 279, 286–287
(1978), the majority opinion in *Branzburg* when read
together with the concurring opinion of Justice Powell,
whose agreement was necessary to achieve that major-
ity, recognized a qualified journalist's privilege the
parameters of which are to be determined in a manner
"comparable to the balancing test adopted by [the
supreme] court in *Knops*—balancing freedom of the
press against a compelling and overriding public inter-
est in the information sought." *Zelenka*, 83 Wis. 2d at
618, 266 N.W.2d at 287.[6] Indeed, Justice Powell's con-
curring opinion in *Branzburg* noted, as did *Green Bay
Newspaper Co.*, 113 Wis. 2d at 422, 335 N.W.2d at 373,
that constitutional protections afforded the press mili-
tated against using "the news media as 'an
investigative arm' " of litigants. *Branzburg*, 408 U.S. at
709 (Powell, J., concurring). The striking similarity
between the analysis in *Branzburg* and *Knops*, which
were both decided under the First Amendment, and the
analysis in *Green Bay Newspaper Co.*, which was

---

know who had bombed the building: "it would unnecessarily
impede the solving of this case to require the state to go through
the empty ritual of proving that which is already obvious,
namely, that the identity of the culprits is unknown." *Id.*, 49
Wis. 2d at 659, 183 N.W.2d at 99.

[6] Most of the federal circuit courts of appeals have similarly
concluded that *Branzburg* recognized a qualified journalist's
privilege. *See Schoen v. Schoen*, 5 F.3d 1289, 1292 n.5 (9th Cir.
1993) (collecting cases).

194

decided under Article I, section 3, leads us to conclude that the scope of the qualified journalist's privilege is the same whether measured under the First Amendment or under Article I, section 3, and that "the balancing approach of *Knops*—balancing a privilege of nondisclosure against the societal values favoring disclosure—" remains the law in this state. *Zelenka*, 83 Wis. 2d at 619, 266 N.W.2d at 287.[7] Accordingly, we look to cases interpreting the journalist's qualified privilege under the First Amendment in civil cases for guidance in determining the scope of that privilege here.

The first-amendment analysis of the journalist's qualified privilege in civil cases where the journalist is not a party to the litigation most akin to that of *Green Bay Newspaper Co.* is that undertaken by the two Ninth Circuit decisions in *Schoen v. Schoen*—5 F.3d 1289 (9th Cir. 1993) and 48 F.3d 412 (9th Cir. 1995). *Schoen* involved an intra-family lawsuit; the founder of the U-Haul Corporation was sued by two of his sons for defamation after he accused them of complicity in the murder of their brother's wife. *Schoen*, 48 F.3d at 413. The elder Schoen was interviewed extensively by the author of *Birthright*, a book about the Schoens' fight for control over U-Haul. *Ibid.* Although they did not claim that their father made any defamatory statements to the book's author, the sons subpoenaed the author to appear at a deposition and demanded that he "produce all documents and recordings" relating to the family dispute and the death of their sister-in-law. *Id.*, 48 F.3d at 414. The author had not promised confidentiality in

---

[7] *Cf. State v. Bagley*, 164 Wis. 2d 255, 260 n.1, 474 N.W.2d 761, 763 (Ct. App. 1991) (At least insofar as the free-speech components are concerned, the protections afforded by both the United States and Wisconsin constitutions are the same.).

return for the elder Schoen's cooperation. *Schoen*, 5 F.3d at 1290. *Schoen*, however, recognized the danger to the values protected by the First Amendment's "free press" clause of requiring journalists to comply with discovery subpoenas even when confidential information was not sought:

> "[T]he threat of administrative and judicial intrusion into the newsgathering and editorial process; the disadvantage of a journalist appearing to be an investigative arm of the judicial system or a research tool of government or of a private party; the disincentive to compile and preserve non-broadcast material; and the burden on journalists' time and resources in responding to subpoenas."

*Id.*, 5 F.3d at 1294–1295. (Citation omitted.)

Application of a qualified journalist's privilege in the context of civil litigation requires a balancing between, on the one hand, the need to insulate journalists from undue intrusion into their news-gathering activities and, on the other hand, litigants' need for every person's evidence. *See Schoen*, 48 F.3d at 415–416. This balancing is required irrespective of whether the journalist's information was obtained in return for a promise of confidentiality. *See Green Bay Newspaper Co.*, 113 Wis. 2d at 418, 335 N.W.2d at 371 (confidentiality promised); *Schoen*, 48 F.3d at 416 (confidentiality not promised). *Schoen* applied the following test:

> [W]here information sought is not confidential, a civil litigant is entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege [that is, that the person asserting the privilege is a "journalist"] by a nonparty only upon a

showing that the requested material is: (1) unavailable despite exhaustion of all reasonable alternative sources; (2) noncumulative; and (3) clearly relevant to an important issue in the case. We note that there must be a showing of actual relevance; a showing of potential relevance will not suffice.

*Id.*, 48 F.3d at 416. We examine each aspect of this test in turn.

The first element of the *Schoen* test, that there be no alternate sources for the information sought, mirrors the rule adopted by *Green Bay Newspaper Co.* for criminal cases involving information obtained by a journalist in return for a promise of confidentiality. *See Green Bay Newspaper Co.*, 113 Wis. 2d at 422–423, 335 N.W.2d at 373–374. *A fortiori*, there is no impediment to its use in civil cases, where neither a defendant's right to compulsory process nor the state's crime-solving responsibilities is implicated. The second element of the test, that the information sought from the journalist not duplicate that which is already known by the party seeking the information is, in essence, a weighing of the information's utility to a party against the burden on the witness to produce that information. This principle already shields witnesses who are not journalists from having to comply with discovery subpoenas when to do so would be onerous. *See* RULE 804.01(3)(a), STATS. (trial court may issue protective order to "protect a party or person from annoyance . . . oppression, or undue burden or expense"); *Vincent & Vincent, Inc. v. Spacek*, 102 Wis. 2d 266, 271–272, 306 N.W.2d 85, 88 (Ct. App. 1981); 8 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2037 at 496 (1994). The "clearly relevant" third aspect of the three-

part *Schoen* test works in synergism with the first element to prevent the impressment of journalists as involuntary investigators for the parties. The corollary requirement that there be a showing of "actual" and not "potential" relevance prevents resort to newsgatherers' files and knowledge with the hope, to paraphrase in another context the forever optimistic Charles Dickens character Wilkins Micawber, that something will "turn up."[8] This ensures that " 'the burden on journalists' time and resources in responding to subpoenas,' " *Schoen*, 5 F.3d at 1295 (citation omitted), will be imposed only when necessary. We adopt this test for civil actions in Wisconsin.

A trial court's decision whether to order discovery is one vested in its sound discretion. *Vincent & Vincent, Inc.*, 102 Wis. 2d at 270, 306 N.W.2d at 87. A trial court's discretionary determination will be upheld on appeal if it is "consistent with the facts of record and established legal principles." *Lievrouw v. Roth*, 157 Wis. 2d 332, 358-359, 459 N.W.2d 850, 859-860 (Ct. App. 1990). Although the trial court did not anticipate this decision, and did not, therefore, find that Dr. Faber's attorney had made the required showing in order to pierce the journalist's qualified privilege, we can sustain the trial court's decision if that decision is, nonetheless, supported by the record. *See Kolpin v. Pioneer Power & Light Co.*, 162 Wis. 2d 1, 30, 469 N.W.2d 595, 606 (1991).

In his affidavit opposing the journalists' motion for a protective order, Dr. Faber's attorney specified what we have counted as ten areas into which he sought

---

[8] *See generally* CHARLES DICKENS, DAVID COPPERFIELD.

inquiry. As noted, the trial court limited its order to two of these areas: communications between Filmanowicz or Dale with either the plaintiffs or their designated expert witnesses. Dr. Faber's attorney has not demonstrated in the record that we have before us that he has exhausted all reasonable alternative sources for the information he seeks. It is clear from the trial court's decision that there are other witnesses whom Dr. Faber could have subpoenaed or interviewed in lieu of deposing Filmanowicz and Dale, namely the plaintiffs or their designated expert witnesses. The record, however, does not reveal that he did this. Further, we do not know if other sources for the information are available because the record does not indicate what alternatives to the deposing of Filmanowicz and Dale the trial court considered and its reasons for rejecting them. Therefore, Dr. Faber's attorney has not demonstrated that his investigation has been sufficiently thorough and comprehensive so that further efforts to obtain the information he seeks would not be successful. Moreover, the record does not demonstrate that the information Dr. Faber's attorney seeks, within the scope of the trial court's order, is "clearly relevant to an important issue in the case," bearing in mind "that there must be a showing of actual relevance; a showing of potential relevance will not suffice." *See Schoen*, 48 F.3d at 416. Accordingly, we reverse the trial court's order.

*By the Court.*—Order reversed.